**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| C&K NUCO, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )  No. 13 C 4006 |
| | ) |
| EXPEDITED FREIGHTWAYS, LLC, | )  Judge Rebecca R. Pallmeyer |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

On January 25, 2013, C&K NuCo, LLC ("C&K") purchased substantially all of the assets of Defendant Expedited Freightways, LLC ("Expedited"). Three days later, a truck driver for the business was involved in a fatal accident after failing to properly brake. Unbeknownst to C&K, a few months prior to the accident, the driver of the truck had failed an alcohol test performed at the direction of Expedited. Because of alleged damages suffered by C&K as a result of the accident, C&K brought this action against Expedited alleging that Expedited engaged in fraudulent misrepresentation (Count II) and breached provisions of the purchase agreement by failing to satisfy its representations and warranties (Count I(a)-(c)), and seeking equitable rescission of the purchase agreement (Count III). In addition, C&K alleges that Expedited failed to remit post-closing revenue payable to C&K under the contract (Count I(d)). In its counterclaim, Expedited alleges that C&K also breached contract provisions requiring payment to Expedited of additional sums based on C&K's post-agreement earnings, and certain pre-closing revenue. Expedited now moves to dismiss Counts I(a)-(c), II, and III of C&K's complaint [108], and moves for summary judgment on its counterclaims [86]. C&K moves for summary judgment on Count I(d) of its complaint. [121] For the reasons explained below, Expedited's motion to dismiss and C&K's motion for summary judgment are both granted. Expedited's motion for summary judgment is granted in part and denied in part.

## BACKGROUND

C&K is an Illinois limited liability company with its principal place of business in Chicago Ridge, Illinois, created for the sole purpose of acquiring Expedited's assets.[1] (Expedited L.R. 56.1 Stmt. [87] ¶ 1.) Expedited is a Georgia limited liability company with its principal place of business in Atlanta, Georgia.[2] (*Id.* ¶ 4.) Prior to selling its assets to C&K, Expedited was engaged in the business of trucking services and "intermodal drayage," *i.e.*, transportation of goods, throughout Georgia, Virginia, Michigan, and South Carolina. (Asset Purchase Agreement, hereinafter "APA," at Preamble A.) As explained in the court's prior order, the court has jurisdiction over this case pursuant to 28 U.S.C. § 1332. *C&K NuCo, LLC v. Expedited Freightways, LLC*, No. 13 C 4006, 2014 WL 4913446, at *5 (N.D. Ill. Sept. 30, 2014) ("The amount in controversy exceeds $75,000, and . . . [C&K] is diverse in citizenship from [Expedited].").

## I. Asset Purchase Agreement

On January 25, 2013, C&K, C&K Trucking, LLC (C&K's parent company), Expedited, and Chad Rosenberg[3] (a principal of Expedited), entered into the APA, pursuant to which Expedited agreed to sell C&K substantially all of its assets in exchange for $825,000, plus an

---

[1]  The sole member of C&K is C&K Holdings Acquisition, LLC, an Illinois limited liability company. (Expedited L.R. 56.1 Stmt. ¶ 2.) The members of C&K Holdings are: Michael Burton, an individual residing in Illinois; Arthur Zimmerly IV, an individual residing in Florida; Joe Kendall, an individual residing in Illinois; Kevin Shaughnessy, an individual residing in Illinois; Steve Wolf, an individual residing in Illinois; Robert Vladem, an individual residing in Illinois; James Hardy, an individual residing in Illinois; and Michael Bifulco, an individual residing in Florida. (*Id.* ¶ 3.)

[2]  EF Services, a Georgia limited liability company, is the sole member of Expedited. (*Id.* ¶¶ 5-6.) EF Services is owned by the Rosenberg 2011 Trust and Rosenberg Advisory Company, LLC. (*Id.* ¶ 7.) The Rosenberg 2011 Trust is an irrevocable trust whose trustees are Chad Rosenberg, Chris Graham, and Jeff Peller, all of whom reside in Georgia. (*Id.* ¶ 8.) Rosenberg Advisory Company, LLC, is a Florida limited liability company whose sole member is CR Management Trust. (*Id.* ¶ 9.) The trustees of CR Management Trust are Chad Rosenberg, Chris Graham, and Jeff Peller, all of whom reside in Georgia. (*Id.* ¶ 11.)

[3]  Rosenberg was originally a defendant in this lawsuit, but the court dismissed all claims made against him. *C&K NuCo*, 2014 WL 4913446, at *16-17.

additional amount payable to Expedited if C&K achieved a profit in excess of $400,000 within the first 100 days after the closing date. (Expedited L.R. 56.1 Stmt. ¶¶ 15-18; APA § 2.01.) The assets purchased by C&K pursuant to the APA included Expedited's customer lists; lease agreements entered into between Expedited and independent contractors for the provision of trucking services and equipment; and office equipment, supplies, and furniture. (APA § 1.01.)

### A.    Purchase Price Adjustment

As noted, the APA included a provision for additional compensation to Expedited in the event that C&K achieved an Aggregate Direct Profit in excess of $400,000 within the first 100 days after the closing date.  This additional compensation, called the Purchase Price Adjustment, is described in Section 2.03, which provides that the Purchase Price Adjustment will be calculated at approximately 71% of C&K's Aggregate Direct Profit within the first 100 days after closing.[4] (Id.; APA §§ 2.03(a)(ii), 2.03(a)(v).)  In order to avoid a dispute between the parties over whether C&K had in fact achieved $400,000 in Aggregate Direct Profit, Section 2.03 requires C&K to provide Expedited with estimates of C&K's Aggregate Direct Profit for each month, as well as a "reconciled statement" estimating C&K's Aggregate Direct Profit for the entire 100-day period. (Id. § 2.03(b).)  Should a dispute arise, the section provided that any disputed amount(s) related to the financial statements provided by C&K would be determined by a neutral accounting firm. (Id. § 2.03(c).)

C&K did not provide Expedited with any financial statements reflecting its Aggregate Direct Profit during the 100-day period, and C&K did not pay Expedited a Purchase Price Adjustment.  C&K's internal spreadsheets, however, show that the company had $2,162,826.37 in revenues and $1,698,204.22 in costs during the first 100 days following the closing date. (Expedited L.R. 56.1 Stmt. ¶¶ 26-27; C&K Resp. to Expedited L.R. 56.1 Stmt. [112] ¶ 26.)

---

[4]    The APA defines Aggregate Direct Profit as the aggregate amount of C&K's net revenues generated from the purchased assets within the first 100 days after the closing date. (Id. ¶¶ 20-21; APA §§ 2.03(a)(i), 2.03(a)(iv).)  The Purchase Price Adjustment is calculated by dividing that Aggregate Direct Profit figure by $600,000 and then multiplying it by $425,000. The court takes judicial notice that $425,000 divided by $600,000 is .7083333.

Based on this information, in June 2013, C&K estimated its Aggregate Direct Profit was $464,622.15 and that it owed Expedited a Purchase Price Adjustment of $329,107.36.[5] (Expedited L.R. 56.1 Stmt. ¶¶ 28, 30; C&K L.R. 56.1 Stmt. ¶ 9; Hardy Dep. at 29.)

Despite its records, C&K now denies that it achieved an Aggregate Direct Profit of $464,622.15 during the 100-day period after closing, and asserts that the $2,162,826.37 in revenue reflected in its internal spreadsheets represents an approximation derived from the company's internal accounting reports. (C&K Resp. to Expedited L.R. 56.1 Stmt. ¶ 26; C&K L.R. 56.1 Stmt. ¶ 9.) According to C&K, the revenue figure is overstated in that it includes $433,560.10 in receivables collected by Expedited for loads delivered or transported after the closing date. Those receivables, C&K urges, are still owed to C&K under Section 5.03 of the APA.[6] (C&K L.R. 56.1 Stmt. ¶ 11.) Because C&K has not yet received these funds from Expedited, C&K contends, it cannot determine the actual amount of its revenue or Aggregate Direct Profit, or whether Expedited is entitled to a Purchase Price Adjustment. (C&K Resp. to Expedited L.R. 56.1 Stmt. ¶¶ 28, 30; C&K L.R. 56.1 Stmt. ¶¶ 10-12.)

---

[5] This Purchase Price Adjustment figure was calculated by C&K using the formula from Section 2.03(b) of the APA: $464,622.15 divided by $600,000 multiplied by $425,000 equals $329,107.36. (*Id.* ¶ 30; Hardy Dep. at 33; APA § 2.03(b).) Expedited does not dispute the Purchase Price Adjustment figure or these calculations. (Expedited L.R. 56.1 Stmt. ¶ 30.)

[6] C&K also asserts that it is currently involved in a legal dispute with company, American Global Logistics ("AGL"), over approximately $412,481.04 allegedly owed to C&K for revenue generated within the first 100 days following the closing of the transaction. (*Id.* ¶ 11; C&K Opp. to Expedited SJ Mot. at 2-3); *see C&K Trucking LLC et al. v. American Global Logistics, LLC*, 14-cv-00298 (Doc # 1). In that case, which is unrelated to this dispute, C&K alleges that ALG breached certain transportation services contracts entered into between C&K and ALG by failing to compensate C&K for freight charges that it incurred during its transportation of loads on behalf of ALG. (*Id.*) The court documents filed in that case, however, show that American Global Logistics made an offer for judgment on the $412,481.04 requested by C&K, which C&K declined. *C&K Trucking LLC*, 14-cv-00298 (Doc # 73-1). American Global Logistics subsequently sent a check to C&K for this amount and asked C&K to cash it. *Id.*

### B.  Load Revenue

Under Section 5.03 of the APA, the parties agreed that Expedited would be entitled to revenue generated from, and be responsible for all expenses related to, loads transported or delivered by its drivers prior to the closing date of the transaction, while C&K would be entitled to revenue generated from, and responsible for all expenses related to, loads transported or delivered by its drivers after the closing date.  (APA § 5.03.)  Acknowledging "that either party may originally collect funds to which the other is entitled, whether because such payment is misdirected or otherwise," Section 5.03 provides that the parties will "work in good faith to timely account for and properly direct payments owing to the other."  (*Id.*; Expedited L.R. 56.1 Stmt. ¶ 33.)  This section further provides "that any funds collected on behalf of the other party shall be held in trust in the interim until remitted to the other party."  (*Id.*)

Both parties appear to have collected load revenue to which the other party is entitled under Section 5.03.  Expedited admits that it collected $356,839.50 in revenue from loads transported or delivered after the closing date, and C&K admits that it collected $128,602.28 in revenue from loads transported or delivered before the closing date.  (Expedited Resp. to C&K L.R. 56.1 Stmt. ¶ 4; Expedited L.R. 56.1 Stmt. ¶¶ 34-35.)  Yet, each party disputes that the other party is entitled to recovery.  C&K asserts that the amount of post-closing revenue collected by Expedited is greater than the amount of pre-closing revenue collected by C&K, and as a result, C&K owes nothing to Expedited under Section 5.03.  (C&K Resp. to Expedited L.R. 56.1 Stmt. ¶ 35.)  Expedited, meanwhile, asserts that the $356,839.50 in post-closing revenue that it received on behalf of C&K is less than the $457,709.64 that C&K owes to Expedited for the Purchase Price Adjustment ($329,107.36) plus the pre-closing revenue collected by C&K ($128,602.28).  (Expedited Resp. to C&K L.R. 56.1 Stmt. ¶ 4.)  Because the net amount owed by C&K under the APA is greater than the net amount that Expedited owes C&K, Expedited

asserts that it has no obligation to pay any post-closing revenue to C&K under Section 5.03. (*Id.*)

### C.    Representations and Warranties

Under Section 4.01, Expedited made a number of representations and warranties, including that it had "complied in all material respects with all material federal, state, local and foreign laws, regulations, [and] ordinances . . . applicable to it." (APA § 4.01(g).)  In addition to its compliance with all laws and regulations, Expedited represented and warranted that, to Expedited's knowledge, there was no basis for any investigation, suit, or claim by any governmental entity, which, "if determined adversely, would have a material adverse effect upon the Purchased Assets." (*Id.* § 4.01(f).)  For purposes of this section, the APA defines "Expedited's knowledge" as "exclusively the actual knowledge of [Chad] Rosenberg and Jim Briles, an officer of Expedited, who would reasonably be expected to have knowledge regarding the accuracy of the fact or matter in question." (*Id.* § 4.01.)  Expedited further represented and warranted that the APA does "not contain any untrue statement of a material fact or omit a material fact necessary in order to make the information or statements herein or therein not misleading." (*Id.* § 4.01(l).)

### D.    Indemnification & Attorney's Fees

The parties also agreed to indemnify each other in the event that one of the parties breached the APA or otherwise caused the other party to suffer losses.  (APA § 6.01.) Expedited, for example, agreed to indemnify C&K for "any out-of-pocket loss, liability, damage, assessment, or expense (including expenses of investigation and defense and reasonable fees and expenses of counsel) of any nature whatsoever . . . sustained, suffered or incurred by C&K" arising out of "any breach of any representation, warranty, covenant or agreement" contained in the APA, or arising out of "Expedited's use and/or ownership of the Purchased Assets and Business through the Closing Date." (APA § 6.01(a)(i)-(ii).)  C&K similarly agreed to indemnify Expedited and its affiliates for any losses or damages to Expedited arising out of C&K's breach

6

of the APA or its operation of the purchased assets and business. (*Id.* § 6.01(b)(i)-(ii).) In the event that one of the parties seeks indemnification under the APA, Section 6.02 limits that party's recovery to $600,000, except for claims arising out of fraud or intentional misrepresentation. (*Id.* § 6.02(a).) This section also prohibits the parties from obtaining indemnification for "punitive, consequential, special damages or lost profits except to the extent it constitutes part of a third party claim." (*Id.* § 6.02(c).)

Under Section 6.05 of the APA, entitled "Remedies Exclusive," the parties further agreed that:

> [T]he rights of [C&K and Expedited] to indemnification relating to this Agreement or the transactions hereby shall be strictly limited to those contained in this Article VI, and such indemnification rights shall be the sole and exclusive remedies of the parties hereto . . . (other than claims of, or causes of action arising from, fraud, gross negligence, intentional misconduct or intentional misrepresentations or claims for equitable relief); provided, however, the foregoing shall not limit the right of any [party] to seek specific performance for a breach of any provision contained in [the APA].

(*Id.* § 6.05.)

Additionally, the parties agreed that the prevailing party in any legal dispute would be entitled to recover attorney's fees:

> Any party to this Agreement who is the prevailing party in any legal or equitable proceeding against any other party brought under or in connection with this Agreement shall be additionally entitled to recover court costs and reasonable attorney's fees from the non-prevailing party. For the purposes of this Agreement, the term 'prevailing party' shall include, without limitation, a party obtaining substantially the relief sought, whether by compromise, settlement or judgment.

(*Id.* § 7.14.)

## II.    Facts Relating to the January 28, 2013 Accident

One of the assets purchased by C&K as part of its transaction with Expedited was a September 2012 Independent Contractor Transportation Services Agreement ("ICTSA") between Expedited and Affiliate Trucking, a company that owned and operated its own trucking

fleet. (Expedited L.R. 56.1 Stmt. ¶ 43.) Arnold Williams ("Williams"), an employee of Affiliate Trucking, drove a truck that Affiliate Trucking had leased to Expedited pursuant to the ICTSA. (*Id.*; C&K L.R. 56.1 Stmt. ¶ 16.)

On November 30, 2012, Williams failed a random alcohol test performed by Concentra Medical Center, a healthcare company that Expedited used to perform alcohol tests on its truck drivers. (Expedited L.R. 56.1 Stmt. ¶ 71 (citing Burton Dep. at 53; Foster Decl. ¶ 5); C&K L.R. 56.1 Stmt. ¶ 17.) When an employee fails an alcohol test, Concentra's internal procedures require the technician who performed the test to contact the Designated Employer Representative ("DER") to communicate the results of the test. (C&K L.R. 56.1 Stmt. ¶ 19.) Expedited's DER at the time of Williams's test was Jimmy Foster. (*Id.* ¶ 20.) Kaysinda Polite, Concentra's technician who performed Williams's test, claims that she spoke to Foster on November 30, 2012, and told him that Williams had tested in excess of the legal limit for blood-alcohol content. (C&K Resp. to Expedited L.R. 56.1 Stmt. ¶ 79; Polite Decl. ¶ 8.) Apart from Polite's declaration, there is no record of the conversation between Polite and Foster, and Foster himself denies that he spoke with Polite or otherwise received notice of the failed test. (Expedited L.R. 56.1 Stmt. ¶¶ 79, 81, 89 (citing Foster Decl. ¶ 12).) There is also no evidence that Foster notified either of his supervisors, Chad Rosenberg or Jim Briles, Expedited's Chief Operating Officer, of the failed test result, and Rosenberg and Briles deny having received any notice of the failed test. (*Id.* ¶¶ 80-81 (citing Rosenberg Decl. ¶¶ 2-3; Briles Decl. ¶¶ 3-4).)

After the failed test, Williams continued to work on behalf of Expedited as a driver. On January 25, 2013, Williams picked up a load from Expedited and transported it to his home for the weekend. (C&K L.R. 56.1 Stmt. ¶ 26.) Three days later, on January 28, 2013, Williams delivered the load and then, on his return trip, was involved in a fatal vehicle collision. (Expedited L.R. 56.1 Stmt. ¶ 49.) According to the police report, the accident occurred when Williams, unable to timely brake, collided with another vehicle, resulting in a chain reaction collision. (Fourth Am. Compl. [100], Ex. 4.) C&K alleges that, following the accident, Williams

8

was observed disposing of beer cans over a nearby bridge, but an alcohol test administered immediately after the accident was negative. (Fourth Am. Compl. ¶ 40.) Williams was subsequently arrested and charged with reckless homicide. (*Id.* ¶ 41.) In its complaint, C&K alleges that a wrongful death action was brought against it by the estate of the victim, Lauren Baccari, which has since been "resolved." (*Id.* ¶ 42.) C&K's president, Michael Burton, testified in his deposition that this claim was ultimately settled and covered by C&K's liability insurance. (Expedited L.R. 56.1 Stmt. ¶ 50 (citing Burton Dep. at 66).) C&K also alleges that another individual, Joseph Hamilton, filed a lawsuit against C&K asserting a claim for bodily injury. (*Id.* ¶ 51 (citing Burton Dep. at 66); Compl. ¶ 42.) According to Burton, this case is currently in the discovery phase. (Expedited L.R. 56.1 Stmt. ¶ 51 (citing Burton Dep. at 66).)

Expedited did not inform C&K of Williams's failed alcohol test before the parties entered into the APA. Upon learning of Williams's failed alcohol test,[7] C&K and Foster (who by then had become C&K's employee) searched for evidence that Expedited had been provided with notice of the test. (Expedited L.R. 56.1 Stmt. ¶ 76.) Neither C&K nor Foster found any written notification. (*Id.* ¶ 77.) During the due diligence period prior to executing the APA, C&K had the opportunity to inspect the driver files of Expedited, including that of Williams. (Expedited L.R. 56.1 Stmt. ¶ 94.) There is no evidence, however, that reference to the failed alcohol test appeared in Williams's file. Expedited further asserts that, based on its due diligence, C&K knew that Expedited had certain problems with its management and operations and could not provide accurate financial records. (Expedited L.R. 56.1 Stmt. ¶¶ 101-02, 104.) Expedited claims that C&K cited these problems in negotiating a 30% discount in the purchase price. (*Id.* ¶ 104.)

C&K has not included the revenue from Williams's January 28, 2013 load in its post-closing revenue calculations because it contends that Williams was operating under Expedited's

---

[7] In his deposition, Burton testified that C&K first learned of the failed test after receiving quarterly results from Concorde of the random alcohol tests performed on behalf of the business. (Burton Dep. at 54.)

authority at the time of the accident. Even though the ICTSA was one of the assets that C&K purchased from Expedited on January 25, 2013, Expedited's Department of Transportation ("DOT") information was displayed on a placard on the door of Williams's truck, and the Federal Motor Carrier Safety Administration did not authorize a change in operating authority from Expedited to C&K until February 4, 2013. (C&K Resp. to Expedited L.R. 56.1 Stmt. ¶ 68; C&K L.R. 56.1 Stmt. ¶¶ 29-30.) Expedited, meanwhile, disputes that it had any authority over Williams or his truck after the closing date of the transaction, and asserts that any load revenue obtained from Williams's delivery belongs to C&K. (Expedited L.R. 56.1 Stmt. ¶¶ 68, 111.)

## III.  Procedural History

On May 20, 2013, C&K filed a complaint against Expedited and Chad Rosenberg, alleging that Expedited and Rosenberg caused C&K to suffer damages and other costs incurred as a result of the January 28, 2013 accident and asking for indemnity from Expedited and Rosenberg for those costs. (Compl. [1] ¶¶ 38, 42.) C&K amended its complaint twice. In its third amended complaint, C&K added claims for breach of contract, fraud, and equitable rescission. (Third Am. Compl. [42] ¶¶ 54, 73, 80, 88.) C&K alleged that Expedited and Rosenberg fraudulently concealed Williams's failed alcohol test and breached representations and warranties in the APA that they had complied with all laws and had not concealed any material facts. (*Id.* ¶ 54.) C&K also alleged that Expedited breached Section 5.03 of the APA by failing to provide C&K with revenue collected by Expedited from loads transported or delivered by C&K's drivers after the closing date. (*Id.*) Expedited and Rosenberg moved to dismiss the third amended complaint (First Mot. to Dismiss [108]), and Expedited filed a breach of contract counterclaim against C&K, alleging that C&K itself breached the APA by failing to provide Expedited with a Purchase Price Adjustment or financial statements of C&K's Aggregate Direct Profit as required under Section 2.03. (Expedited Ans. & Counterclaims [60] ¶¶ 18, 29.) Expedited also alleges that C&K failed to provide Expedited with pre-closing

revenue from loads transported or delivered by Expedited's drivers as required under Section 5.03. (*Id.* ¶¶ 40, 46.)

In an opinion dated September 30, 2014, the court granted Expedited and Rosenberg's motion to dismiss on all but one count. Left standing was C&K's breach of contract claim against Expedited for failing to remit post-closing payments owed to C&K under Section 5.03 of the APA. *C&K NuCo*, 2014 WL 4913446, at *1. In dismissing C&K's indemnification claim, the court reasoned that C&K's request for indemnification from Expedited for the January 28, 2013 accident depended on whether C&K had incurred any liability in lawsuits brought by victims of the accident. *Id.* at *9. Because there had been no liability determination made in any underlying lawsuit, the court determined that C&K's indemnification claim was not ripe for review. *Id.* at *9-11. For the same reasons, the court dismissed C&K's breach of contract claim against Expedited for its alleged failure to satisfy its representations and warranties: because the only harm allegedly suffered by C&K as a result of Expedited's breach was liability for the January 28, 2013 accident, C&K had not yet suffered any harm. *Id.* at *14.

The court also dismissed C&K's fraud claim on the grounds that C&K did not allege that either Expedited or Rosenberg had knowledge of Williams's failed alcohol test when they signed the APA. *Id.* at *16. Because the complaint failed to state a claim for fraud, moreover, the court held that C&K's claim for equitable rescission of the APA based on the alleged fraud had to be dismissed, as well. *Id.* As for C&K's request for equitable rescission based upon Expedited's failure to provide C&K with post-closing revenue, the court dismissed this claim because C&K's complaint failed to allege that Expedited's alleged nonperformance was significant enough to warrant rescission. *Id.*

With respect to C&K's claims against Rosenberg, the court explained that in order to state a claim for breach of contract against Rosenberg, C&K "must allege facts that plausibly demonstrate that Rosenberg individually breached the APA." *Id.* at *17. The provisions of the APA that Expedited and Rosenberg allegedly breached, however, did not apply to Rosenberg,

11

and thus Rosenberg could not be held liable to C&K for breach of contract. The court dismissed C&K's claims against Rosenberg with prejudice. *Id.*

After the court dismissed C&K's third amended complaint, C&K filed a fourth amended complaint against Expedited, re-asserting claims for breach of contract (Count I), fraudulent misrepresentation (Count II), and equitable rescission (Count III). (Fourth Am. Compl. ¶¶ 64-88.) In Count I(a)-(c), C&K alleges that Expedited breached its representations and warranties under Section 4.01 of the APA by: (a) dispatching a load to Williams in violation of DOT regulations, 49 C.F.R. §§ 382.501(b), 382.201, 382.503, 40.285; (b) failing to comply with applicable laws in the retention, training, and supervision of its drivers; and (c) failing to disclose Williams's failed alcohol test. (*Id.* ¶ 67.) In Count I(d), C&K alleges that Expedited breached Section 5.03 of the APA by failing to provide C&K with post-closing revenue that Expedited collected for loads transported or delivered by C&K's drivers. (*Id.*) In Count II, C&K alleges that Expedited knew or should have known about Williams's failed alcohol test, and that it made false representations and/or concealed material information about the failed test. (*Id.* ¶¶ 73, 75-77.) Because of Expedited's fraudulent conduct, in Count III, C&K alleges that it is entitled to equitable rescission of the parties' agreement. (*Id.* ¶¶ 87-88.) C&K further alleges that Expedited's actions caused C&K to suffer harm in the form of expenses and liability exposure related to lawsuits filed against C&K for the January 28, 2013 accident; damage to C&K's reputation and its ability to recruit drivers; and loss of customers, business, profits, and "goodwill" it had acquired as a result the transaction. (*Id.* ¶¶ 58-59, 69.)

Expedited has moved to dismiss Counts I(a)-(c), II, and III of C&K's fourth amended complaint, and both parties have moved for summary judgment on their breach of contract claims based on the other party's failure to remit load revenues under Section 5.03 of the APA. (Expedited SJ Mot. [86] at 1-2; C&K SJ Mot. [121] at 1.) Expedited has also moved for summary judgment on its breach of contract claim based on C&K's failure to provide Expedited

with a Purchase Price Adjustment under the contract, and requests attorney's fees based on its alleged status as a "prevailing party" under the APA. (Expedited SJ Mot. at 1-2.)

**DISCUSSION**

## I. Expedited's Motion to Dismiss

Generally, a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a). To survive a motion to dismiss for failure to state claim under Rule 12(b)(6), the complaint need only contain sufficient facts to state a plausible claim, that is, "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2009)). The court accepts all well-pleaded factual allegations contained in the complaint as true. *Killingsworth v. HSBC Bank Nevada, N.A.*, 507 F.3d 614, 618 (7th Cir. 2007). Allegations of fraud are subject to a heightened pleading standard. Under Rule 9(b), "a party must state with particularity the circumstances constituting fraud or mistake," though "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." FED. R. CIV. P. 9(b).

In its motion, Expedited urges this court to dismiss C&K's complaint under Rule 12(b)(6) for the same reasons that the court dismissed C&K's third amended complaint. Specifically, Expedited argues that C&K's breach of contract claim based on Expedited's alleged failure to satisfy its representations and warranties is not ripe for review because C&K is only entitled to receive indemnification for the alleged breach and C&K has not been held liable in any lawsuits relating to the January 28, 2013 accident. (Expedited Mot. to Dismiss at 1-2). With respect to C&K's claims for fraud and equitable rescission, Expedited asserts that these claims fail because C&K has not alleged that Expedited had actual knowledge of Williams's failed test result, nor has C&K identified any damages that resulted from Expedited's alleged fraudulent conduct. (*Id.* at 2.) The court addresses each of Expedited's arguments in turn.

A. **Breaches of Representations and Warranties under Section 4.01 (Count I(a)-(c)**)

In its earlier ruling, this court concluded that C&K's claim for indemnification for litigation costs arising out of the January 28, 2013 accident was unripe because no liability determination had been made in any lawsuits filed against C&K by victims of the accident. Expedited argues that the court's reasons for dismissing C&K's indemnification claim apply with equal force to C&K's claim that Expedited breached its representations and warranties under Section 4.01 of the APA. (Expedited Mot. to Dismiss at 2.) The APA, Expedited urges, provides for indemnification as the exclusive remedy for claims brought by the parties relating to the contract, so C&K's claim that Expedited breached Section 4.01 is tantamount to a claim for indemnification. (*Id.*) In response, C&K asserts that indemnification is not its sole and exclusive remedy for a breach of a representation or warranty contained in the APA, and contends that it is entitled to receive damages for Expedited's breach, as well. (C&K Opp. to Expedited Mot. to Dismiss [120] at 12.)

Illinois law allows parties to limit their contractual rights and remedies by express agreement. *See Lake County Trust Co. v. Two Bar B, Inc.*, 182 Ill. App. 3d 186, 192, 537 N.E.2d 1015, 1019 (Ill. App. Ct. 1st Dist. 1989). When construing these agreements, courts look to "whether a reasonable construction of the contract indicates that the parties intended for a limited remedy to be exclusive." *CogniTest Corp. v. Riverside Pub. Co.*, 107 F.3d 493, 498 (7th Cir. 1997). Unless it is clear that the parties intended to limit their remedies, the court must read the contract to allow cumulative rather than exclusive remedies. *Cordiant MN, Inc. v. David Cravit & Assoc., Ltd.*, 96 C 4276, 1997 WL 534308, at *8 (N.D. Ill. Aug. 19, 1997) (citing *Nitrin, Inc. v. Bethlehem Steel Corp.*, 35 Ill. App. 3d 596, 607, 342 N.E.2d 79, 86 (Ill. App. Ct. 1st Dist. 1976)).

In this case, Section 6.05 of the APA states that the parties' indemnification rights "shall be strictly limited to those contained in this Article VI, and such indemnification rights shall *be*

*the sole and exclusive remedies* of the parties." (APA § 6.05 (emphasis added).) C&K nevertheless insists that Section 6.05 is not an exclusive remedy provision. Rather, C&K contends, Section 6.05 merely clarifies that the parties may only seek indemnification to the extent such indemnification rights are expressly permitted under the contract. (C&K Opp. to Expedited Mot. to Dismiss [120] at 13.) The court disagrees. C&K's reading of Section 6.05 appropriately characterizes the first part of the provision, but it ignores the remaining language, which provides that indemnification is the "sole and exclusive" remedy of the parties. If this language itself is not clear enough, the fact that Section 6.05 is entitled "Remedies Exclusive" further indicates the parties intended for indemnification to be their exclusive remedy under the contract. That interpretation is bolstered by the parties' decision to spell out exceptions to this limitation; namely, Section 6.05 provides that indemnification is not the parties' sole and exclusive remedy for claims arising out of fraud, gross negligence, intentional misconduct, intentional misrepresentation; claims for equitable relief; and claims seeking specific performance of the contract.[8]

Because indemnification is the only available remedy for Expedited's alleged breach of its representations and warranties under the APA, C&K's claim is essentially one for indemnification. And as the court explained in its prior order, C&K may not seek indemnification from Expedited for litigation costs arising out of the January 28, 2013 accident until liability determinations have been made in those underlying cases. *C&K NuCo*, 2014 WL 4913446, at *7 ("[A] promise to indemnify takes effect only after liability has been determined, and may or may not cover the costs of litigation." (citing *Medline Indus., Inc. v. Ram Medical, Inc.*, 892 F. Supp. 2d 957, 964-65 (N.D. Ill. 2012))). In its complaint, C&K alleges that two lawsuits have

---

[8]     C&K argues that if Section 6.05 were an exclusive remedy provision, this would defeat Expedited's breach of contract claim seeking recovery of the Purchase Price Adjustment and pre-closing revenue owed to Expedited under Section 5.03 of the APA. (C&K Opp. to Expedited Mot. to Dismiss at 13.) Expedited seeks specific performance for C&K's alleged breaches, however—a remedy expressly permitted under Section 6.05.

been filed against it arising out of the January 28, 2013 accident, but it does not allege that it has been held liable or that it has been required to pay damages in these cases. C&K, for example, alleges that that the lawsuit brought against it by the estate of accident-victim Lauren Baccari was "resolved," but it does not allege any other facts about the outcome of the case, such as whether it was found liable.[9] An allegation that an underlying lawsuit has been "resolved," without more, is not sufficient to state a claim for indemnification. C&K's complaint also alleges that the lawsuit filed against it by Joseph Hamilton, who was injured in the accident, is currently ongoing. While it is possible that C&K may face liability for Hamilton's injuries at some point in the future, C&K must wait until this future date to seek recovery from Expedited.

C&K further alleges that, as a result of Expedited's breach of its representations and warranties under Section 4.01, as well as the January 28, 2013 accident, C&K lost profits, customers, and the "goodwill" it had acquired from the purchase of Expedited. C&K's ability to recruit truck drivers has also been damaged, C&K alleges. It is unclear from the complaint whether C&K seeks indemnification from Expedited for these losses. To the extent C&K seeks damages, C&K's claim is barred for the reasons explained above—C&K can only seek indemnification for Expedited's alleged breach of its representations and warranties. To the extent C&K seeks indemnification, the APA prohibits the parties from obtaining indemnification for consequential or special damages, including lost profits, and there is no question that the losses alleged by C&K in its complaint would fall under the category of consequential or special damages. (APA § 6.02); see, e.g., *Metavante Corp. v. Emigrant Savings Bank*, No. 05-CV-

---

[9] Although the court has only considered the allegations contained in C&K's complaint for purposes of Expedited's motion to dismiss, the court notes that C&K's president, Michael Burton, testified in his deposition that the claim brought by the Baccari estate was settled and covered by C&K's liability insurance at no cost to C&K. A party seeking indemnification for a settled claim with no underlying finding of liability must allege that it paid a settlement, and that this payment was made "in reasonable anticipation of personal liability." *Commonwealth Edison Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA.*, 323 Ill. App. 3d 970, 978, 752 N.E.2d 555, 561 (Ill. App. Ct. 1st Dist. 2001); *Medline Indus., Inc. v. Ram Med., Inc.*, 892 F. Supp. 2d 957, 966 (N.D. Ill. 2012).

1221, 2008 WL 5099619, at *3 (E.D. Wis. Nov. 26, 2008) (parties did not dispute that plaintiff's claims for loss of goodwill, injury to reputation, lost employee hours, and loss of potential customers as a result of defendant's breach were claims for consequential damages); *Cloverhill Pastry–Vend Corp. v. Cont'l Carbonics Prods., Inc.*, 214 Ill. App. 3d 526, 530, 574 N.E.2d 80, 83 (Ill. App. Ct. 1st Dist. 1991) (describing "lost profits, lost business, and damage to reputation and goodwill" as consequential damages).

Lastly, Expedited asserts that C&K fails to state a claim that Expedited breached Section 4.01 because the APA conditions Expedited's representations and warranties on the "actual knowledge" of Rosenberg and Briles, and C&K has failed to allege that either of these individuals had actual knowledge of Williams's failed alcohol test. (Expedited Mot. to Dismiss at 3.) The court need not address this argument, however, because it has determined that C&K's claim for breach of Section 4.01 must be dismissed for the reasons already mentioned; unless C&K alleges that it has been held liable, or is otherwise entitled to indemnification from Expedited, in lawsuits arising out of the January 28, 2013 accident, Plaintiff cannot state a claim against Expedited for breach of its representations and warranties.

## B. Fraud and Equitable Rescission (Counts II and III)

In Section 4.01 of the APA, Expedited represented and warranted that it had complied with all laws and regulations, had lawfully retained its independent contractors, and had not omitted any material facts from the APA. (APA § 4.01.) In Count II of its complaint, C&K alleges that all of these representations were fraudulent because Expedited failed to disclose to C&K that, after Williams had failed his alcohol test, Expedited continued to allow Williams to operate a truck for the company, an operation that C&K characterizes as unlawful. Under Illinois law, the elements of fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from its reliance on the statement. *Massuda v. Panda Express, Inc.*, 759 F.3d 779,

783 (7th Cir. 2014). C&K's complaint, therefore, must contain sufficient factual allegations to satisfy each of these five elements.

In its motion to dismiss, Expedited argues that C&K's fraud claim should be dismissed because C&K does not allege that Briles or Rosenberg, who signed the APA on Expedited's behalf, knew about Williams's failed test, and consequently, had knowledge that the representations made by Expedited were false. (Expedited Mot. to Dismiss at 2; Expedited Reply in Support of Mot. to Dismiss [127] at 2.) In response, C&K points to its allegations that Expedited employee Jimmy Foster was aware of the test results, and asserts that Foster's knowledge can be imputed to Expedited for purposes of C&K's fraud claim. (C&K Opp. to Expedited Mot. to Dismiss at 10-11.) With respect to the knowledge of Briles and Rosenberg, C&K maintains that Briles and Rosenberg had a "non-delegable duty" to know the results of the test. (Fourth Am. Compl. ¶ 21.) Thus, C&K asserts, "whether or not Jimmy Foster followed Expedited's chain-of-command and notified Mr. Briles and/or Mr. Rosenberg of Williams's failed random alcohol test is of no consequence." (Id.)

The court first addresses whether C&K's allegations that Foster was aware of the test results are sufficient to support an inference that Expedited itself had knowledge of this information. Under principles of agency law, the knowledge of a corporate agent acting within the scope of his or her agency is imputed to the corporation if the knowledge relates to a matter within the scope of the agent's authority. *Campen v. Exec. House Hotel, Inc.*, 105 Ill. App. 3d 576, 586, 434 N.E.2d 511, 517 (Ill. App. Ct. 1st Dist. 1982). Here, accepting the allegations contained in C&K's complaint as true, Foster was acting within the scope of his employment when he received the results of Williams's alcohol test on behalf of Expedited. Further, the test was a matter directly related to Foster's employment. The court thus finds that Foster's alleged knowledge of the failed test may be imputed to Expedited.

In addition to alleging that a defendant acted with the requisite knowledge, however, a plaintiff must also sufficiently plead that the defendant acted with the requisite intent, or scienter,

to commit fraud. "Although Rule 9(b) does not require 'particularity' with respect to the [defendant's] mental state, the complaint must still afford a basis for believe that [the plaintiff] could prove scienter." *DiLeo v. Ernst & Young*, 901 F.2d 624, 629 (7th Cir. 1990). C&K's complaint fails in this regard because it does not allege that Foster ever relayed the test results to either Briles or Rosenberg, who made the alleged misstatements on Expedited's behalf. In other words, taking the allegations contained in C&K's complaint as true, C&K's complaint offers no reason to infer that Expedited intentionally concealed the failed alcohol test from C&K.

Nor will the court infer that Expedited had the requisite intent based on the collective actions of its employees, none of which individually could have committed the fraud. The court has not found any Illinois court or Seventh Circuit cases applying the concept of collective corporate intent to cases involving common-law fraud. Notably, however, the concept of collective corporate intent has been explicitly rejected by the Seventh Circuit as a basis for corporate liability in securities fraud cases. *See Makor Issues & Rights, Ltd. v. Tellabs Inc.*, 513 F.3d 702, 707 (7th Cir. 2008) (noting that if an employee accidentally overstated company's earnings, and those overstatements were reported in good faith up the line to senior management, there would be no corporate scienter); *see also Southland Sec. Corp. v. INSpire Ins. Solutions, Inc.*, 365 F.3d 353, 366 (5th Cir. 2004) (to establish securities fraud, a court must "look to the state of mind of the individual corporate official or officials who make or issue the statement . . . rather than generally to the collective knowledge of all the corporation's officers and employees acquired in the course of their employment" (footnote omitted)).

In *Makor Issues & Rights*, the Seventh Circuit explained that the reason for not applying the concept of collective intent to securities fraud cases stems from the hierarchical and differentiated structure of a company, which "makes it quite plausible that a fraud, though ordinarily a deliberate act, could be the result of a series of acts none of which was . . . done with scienter." 513 F.3d at 707-08. The Seventh Circuit's reasons for rejecting the concept of collective intent in securities fraud cases supports rejecting collective intent in common-law

fraud cases, as well. Thus, in this case, C&K's allegations that Jimmy Foster knew of the failed alcohol test are not enough to state a plausible claim that Expedited itself fraudulently concealed the test results without allegations that Briles and Rosenberg, the Expedited agents who made the alleged misrepresentations on Expedited's behalf, were also aware of this information.

This brings the court to C&K's next argument—that it does not need to allege that Rosenberg or Briles knew that Williams had failed the alcohol test so long as these individuals had a "non-delegable duty" to know this information. Whether Briles or Rosenberg had an obligation to know the result of Williams's failed test, however, has no bearing on whether either Rosenberg or Briles actually knew of the failed test, and C&K must allege that Briles or Rosenberg actually knew that the representations contained in the APA were false in order to claim that Expedited fraudulently concealed this information. *See Perkins Dairy Farm, Inc. v. Celotex Corp.*, No. 89 C 20245, 1991 WL 169369, at *4 (N.D. Ill. Feb. 11, 1991) ("For *fraudulent* concealment . . . Plaintiffs must allege that [Defendant] actually *knew* that the representations were false." (emphasis original)); *see also Bank of N. Illinois v. Nugent*, 223 Ill. App. 3d 1, 11, 584 N.E.2d 948, 954 (Ill. App. Ct. 2d Dist. 1991) ("knew or should have known" allegations are not sufficient to plead scienter and intent).

In sum, because C&K's complaint does not allege that Briles or Rosenberg actually knew that Williams had failed the alcohol test, Count II of C&K's complaint is dismissed. For the same reasons, the court also dismisses Count II, which claims that C&K is entitled to equitable rescission of the contract based on Expedited's allegedly fraudulent misrepresentations.

## II.     Motions for Summary Judgment

Summary judgment under Rule 56 is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *J.S. Sweet Co. v. Sika Chem. Corp.*, 400 F.3d 1028, 1032

(7th Cir. 2005). In determining whether a genuine issue of material fact exists, the court will construe all facts and draw all reasonable and justifiable inferences in the light most favorable to the non-moving party. *J.S. Sweet*, 400 F.3d at 1032 (citation omitted). On cross-motions for summary judgment, the standard is the same as that for individual motions for summary judgment, and the court must consider each motion independent of the other. *See Cont'l Cas. Co. v. Nw. Nat'l Ins. Co.*, 427 F.3d 1038, 1041 (7th Cir. 2005).

Both parties in this case have moved for summary judgment on their nearly-identical claims for breach of contract based on the other party's alleged failure to remit load revenues pursuant to Section 5.03 of the APA. Expedited also seeks summary judgment on its claim for breach of contract based on C&K's failure to provide Expedited with a Purchase Price Adjustment, as well as its request for attorney's fees under APA Section 7.14.

### A. C&K's Breach of Contract Claim for Post-closing Load Revenue

C&K requests summary judgment on its claim that Expedited failed to pay C&K post-closing revenue owed to C&K under Section 5.03 of the APA. (C&K SJ Mot. at 1.) Expedited concedes it has collected $356,839.50 in post-closing revenues from loads transported or delivered by C&K's drivers; C&K asserts it is entitled to this amount, plus pre-judgment interest. (*Id.*) The court agrees that there is no genuine issue of disputed material fact as to C&K's entitlement to this amount. Expedited argues that the court should deny C&K's motion for summary judgment because, even if Expedited provides C&K with these funds, Expedited is entitled to a net recovery from C&K for the Purchase Price Adjustment and pre-closing revenues owed to Expedited under Section 5.03. As explained below, whether Expedited is entitled to a Purchase Price Adjustment under the contract cannot be determined at this time, and the $356,839.50 in post-closing revenue owed by Expedited is greater than the $128,608.28 in pre-closing revenue owed by C&K. For these reasons, the court declines to award Expedited an offset at this time, and C&K's summary judgment motion is granted.

**B.     Expedited's Breach of Contract Claims for Pre-closing Load Revenue and Purchase Price Adjustment**

Expedited similarly requests summary judgment on its claim against C&K for breach of contract based on C&K's failure to provide Expedited with pre-closing revenue owed to Expedited under Section 5.03 of the APA. (Expedited SJ Mot. at 2.) Specifically, Expedited argues that because C&K collected $128,608.28 in pre-closing receivables from loads transported or delivered by Expedited's drivers, Expedited is entitled to this amount, plus pre-judgment interest. (*Id.*) C&K does not dispute that it collected $128,608.28 in pre-closing receivables. Instead, C&K contends that Expedited is not entitled to this money because Expedited itself breached the contract by failing to provide C&K with revenues owed to C&K under Section 5.03. (C&K Opp. to Expedited SJ Mot. at 13.)

Under Illinois law, a material breach of a contract will excuse subsequent performance by the other party. *Costello v. Grundon,* 651 F.3d 614, 640 (7th Cir. 2011). To determine whether a breach is material, a court applying Illinois law must ask "whether 'the matter, in respect to which the failure of performance occurs, is of such a nature and of such importance that the contract would not have been made without it.'" *Arrow Master, Inc. v. Unique Forming Ltd.*, 12 F.3d 709, 715 (7th Cir. 1993) (quoting *Haisma v. Edgar*, 218 Ill. App. 3d 78, 86, 578 N.E.2d 163, 168 (Ill. App. Ct. 1st Dist. 1991)). Additionally, courts must "take into account the totality of the circumstances and focus on the inherent justice of the matter," such as "whether the breach defeated the bargained-for objective of the parties; whether the non-breaching party suffered disproportionate prejudice; and whether undue economic inefficiency and waste, or an unreasonable or unfair advantage would inure to the non-breaching party." *Arrow Master*, 12 F.3d at 715. In this case, no reasonable fact finder could find that Expedited's failure to provide C&K with post-closing revenues under Section 5.03 was a material breach that excused C&K's performance. Notably, C&K is not an innocent party; both parties breached Section 5.03, and neither party can excuse its performance under this section by pointing to the other party's non-

performance. Further, because the court has now ordered Expedited to pay the pre-closing revenues to C&K, there would be no injustice in requiring C&K to pay the funds that its owes to Expedited under the same provision. Expedited's motion for summary judgment on its breach of contract claim for C&K's failure to remit post-closing revenues is granted.

On the other hand, the court denies Expedited's request for summary judgment on its breach of contract claim for C&K's failure to provide Expedited with a Purchase Price Adjustment under Section 2.03 of the APA. Expedited's claim that it is entitled to a Purchase Price Adjustment of $329,107.36 is based on C&K's internal spreadsheets, which show that C&K received $2,162,826.37 in revenues and achieved an Aggregate Direct Profit of $464,622.15 during the 100-day period after closing. C&K arrived at the estimated $2,162,826.37 in revenue, however, based on its belief that Expedited had collected $433,560.10 in post-closing load revenue that was owed to C&K under Section 5.03 of the APA. As the court already mentioned, Expedited admits to receiving $356,839.50 in post-closing revenue. Assuming that C&K would have to adjust its revenue downward accordingly, C&K's revenues for the 100-day period following the closing date would be $2,086,105.77, and its Aggregate Direct Profit just $387,901.55.[10]

It is, of course, possible that C&K's gross revenues will be greater than $2,086,105.77 once C&K accounts for the revenue generated from Williams's January 28, 2013 delivery. C&K contends that this revenue is properly credited to Expedited because Williams was operating under Expedited's DOT operating authority at the time of the accident. The court disagrees. As part of the transaction, C&K purchased substantially all of Expedited's assets, including the contract pursuant to which Williams was hired. Once the transaction closed on January 25, 2013, Williams became C&K's driver, and C&K became entitled to the revenue generated from

---

[10] The court arrived at $2,086,105.77 in revenues by subtracting $76,720.60 (the difference between $433,560.10 and $356,839.50) from $2,162,826.37. The court then calculated $387,901.55 in Aggregate Direct Profit by subtracting C&K's revenues by the $1,698,204.22 in costs reflected in its internal spreadsheets.

him. Further, the APA provides that Expedited is only entitled to revenue generated through the closing date, not (as C&K appears to believe) any revenue generated prior to the change in DOT operating authority. Because the amount of revenue generated from Williams's January 28, 2013 delivery is not in the record, however, the court cannot determine its effect on C&K's revenues within the 100-day period following the closing date.

These numbers are significant because Section 5.03 of the APA only requires C&K to provide Expedited with a Purchase Price Adjustment if its Aggregate Direct Profit exceeded $400,000 within the 100-day period following the closing. (APA § 2.03.) Thus, if C&K's Aggregate Direct Profit was only $387,901.55, C&K was under no obligation to provide Expedited with a Purchase Price Adjustment under the contract. If the revenue generated from Williams's January 28, 2013 delivery increased C&K's Aggregate Direct Profit above $400,000, however, Expedited would be entitled to recover a Purchase Price Adjustment.

### C.     C&K's Affirmative Defenses

Finally, the court turns to C&K's affirmative defenses that: (a) C&K's performance was excused because of Expedited's prior material breaches, (b) Expedited caused its own damages, (c) Expedited failed to mitigate its damages, and (d) Expedited made fraudulent misrepresentations to induce C&K to enter into the transaction. Expedited contends that it is entitled to summary judgment on each of these defenses, and the court agrees. (Expedited SJ Mot. at 2.)

With respect to C&K's first affirmative defense, the court has already rejected C&K's assertion that it was not required to perform under the APA because Expedited had breached the contract by failing to provide C&K with post-closing revenue under Section 5.03. As for C&K's argument that its performance was excused because Expedited had failed to satisfy its representations and warranties, any such failure would not excuse C&K's performance under either Section 2.03 (Purchase Price Adjustment) or Section 5.03 (Load Revenues). As discussed above, Section 6.05 of the APA provides that indemnification is C&K's exclusive

24

remedy for Expedited's breach of its representations and warranties under Section 4.01. This exclusive remedy provision shows that the parties did not intend to provide C&K with the right to discontinue its performance and invalidate the agreement based on a breach of the representations and warranties provision. If C&K were permitted to do so, the indemnification clause provided in the APA would become a meaningless limitation.

Nor is the court persuaded by C&K's defenses that Expedited caused its own damages and failed to mitigate its damages by refusing to provide C&K with post-closing revenue owed to C&K under Section 5.03 of the APA. (C&K Opp. to Expedited SJ Mot. at 22-23.) C&K contends that if Expedited had paid C&K the $433,560.10 in post-closing revenue, C&K would have been able to realize the actual amount of its revenues for the 100-day period following the closing date, thus making it possible that C&K could have achieved an Aggregate Direct Profit in excess of $400,000 and also could have provided Expedited with a Purchase Price Adjustment under the contract. (Id. at 23.) Expedited, however, is not requesting damages; rather, Expedited is requesting specific performance of the parties' agreement. C&K's claim that Expedited caused its own damages or failed to mitigate its damages does not apply to this case. Here, both parties breached the APA by failing to provide each other with load revenues under Section 5.03, and both parties are entitled to specific performance under this provision.

In its final affirmative defense, C&K asserts that Expedited is not entitled to recover from C&K for C&K's alleged breach of the APA because Expedited made fraudulent misrepresentations by failing to disclose Williams's failed alcohol test and that Expedited illegally continued to keep Williams as a truck driver after the failed test. As discussed earlier, in order to show that Expedited acted with the requisite intent to commit fraud, C&K must provide the court with factual allegations or evidence that either Rosenberg or Briles knew of Williams's failed alcohol test when they signed the APA. There is no evidence in the record that either Rosenberg or Briles had knowledge of Williams's failed test, and as a result, C&K cannot use this as a basis for precluding Expedited's recovery under the contract.

**D.    Expedited's Claim for Attorney's Fees**

Because Section 7.14 of the APA defines "prevailing party" as "a party obtaining substantially the relief sought, whether by compromise, settlement or judgment," Expedited contends that it became a prevailing party under the contract when it obtained a favorable judgment on its motion to dismiss C&K's third amended complaint.    (Expedited Ans. & Counterclaim at 41-42.)    Based on this dismissal, Expedited alleges that it is entitled to attorney's fees for all claims on which it prevailed and seeks summary judgment on this claim. (*Id.*)  The court dismissed C&K's claims against Expedited without prejudice, however, and a dismissal without prejudice generally does not render a defendant a prevailing party for purposes of obtaining attorney's fees because there is still a chance that the plaintiff may ultimately prevail.  *See, e.g.*, *Szabo Food Service, Inc. v. Canteen Corp.*, 823 F.2d 1073, 1077 (7th Cir. 1987), *cert. dismissed*, 485 U.S. 901 (1988) (explaining that while a defendant remains at risk when a case has been dismissed without prejudiced, a dismissal with prejudice "enables the defendant to say that he has 'prevailed'").   Here, because it is possible that C&K may ultimately prevail on the claims contained in its third amended complaint (which now appear in C&K's fourth amended complaint), the court cannot yet determine whether C&K or Expedited is the "prevailing party" under the contract.

Although C&K may ultimately prevail on its amended claims, Expedited nonetheless contends that it is a prevailing party under the APA because Section 7.14 does not expressly require a *final* judgment in the prevailing party's favor.  (Expedited Reply in Support of SJ Mot. [117] at 14.)  The term "judgment" itself, however, suggests a final, as opposed to preliminary, judgment.  *See, e.g.*, FED. R. CIV. P. 54(a) ("'Judgment' as used in these rules includes a decree and any order from which an appeal lies.").  Further, Section 7.14 provides that the prevailing party must prevail in a "legal or equitable proceeding."  (APA § 7.14.)  The proceedings brought by C&K against Expedited are still ongoing because the court has not dismissed any of C&K's

claims against Expedited with prejudice. Accordingly, at this time, Expedited is not a prevailing party under the APA.

In its summary judgment motion, Expedited also requests the court to grant Rosenberg leave to file a petition for attorney's fees within 30 days of the court's order on Expedited's motion. (Expedited SJ Mot. at 4.) Rosenberg, unlike Expedited, is a prevailing party under the APA because the court dismissed C&K's claims against Rosenberg with prejudice, and as a result, C&K cannot re-assert its claims against him. *See Mostly Memories, Inc. v. For Your Ease Only, Inc.*, 526 F.3d 1093, 1099 (7th Cir. 2008) ("There is no question that a dismissal with prejudice makes the defendant the prevailing party for purposes of an award of attorney's fees under [the Copyright Act].") C&K argues that Rosenberg is not entitled to attorney's fees because he is no longer a party to this lawsuit, but a party is permitted to petition for attorney's fees even after an entry of judgment has been made against it. (C&K Opp. to Expedited SJ Mot. at 14-15); *see* FED. CIV. R. P. 54(d)(2)(B) (providing that a claim for attorney's fees must be made within 14 days after the entry of judgment). C&K also argues that Rosenberg is not entitled to attorney's fees because Section 7.14 does not apply to him. Section 7.14, however, provides a right to attorney's fees for "[a]ny party to this Agreement," and Rosenberg is a party to the APA.

Though C&K's arguments are not persuasive, the court is nevertheless not willing to award fees to Rosenberg in this context. Rosenberg was represented by the same attorneys who represent Expedited and therefore does not appear to have incurred any attorney's fees in this case. Perhaps Rosenberg actually paid Expedited's counsel from his own pocket (which seems unlikely); if so, the court would expect counsel to distinguish the time and effort devoted to representing Rosenberg from the time and effort devoted to defending Expedited. Upon final judgment, the court will award attorney's fees to any party who has incurred them and is entitled to recovery. At this stage in the proceedings, however, the court denies Expedited's request for attorney's fees on behalf of Rosenberg.

Lastly, Expedited requests attorney's fees to the extent that it prevails on the rest of its summary judgment motion. (Expedited SJ Mot. at 3-4.) Expedited has only succeeded in obtaining summary judgment on its breach of contract claim for C&K's failure to remit pre-closing revenue collected by C&K under Section 5.03 of the APA and on C&K's affirmative defenses. C&K prevailed on its equivalent breach of contract claim against Expedited for Expedited's failure to remit post-closing revenue under Section 5.03. The court has ordered Expedited to provide C&K with $356,839.50, and it has ordered C&K to provide Expedited with $128,608.28. Neither C&K nor Expedited can be considered a "prevailing party" entitled to attorney's fees for their equally-successful breach of contract claims.

## CONCLUSION

For the reasons explained above, Expedited's motion to dismiss is granted. [108] Expedited's motion for summary judgment is granted in part and denied in part. [86] C&K's motion for summary judgment is also granted. [121]

ENTER:

Dated: June 17, 2016

REBECCA R. PALLMEYER
United States District Judge